**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-70-RDM** |
| **LUCAS DENNEY,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the Government requests that this Court sentence defendant Lucas Denney to a term of incarceration in the middle of the guideline range as calculated by the United States Probation Department, three years of supervised release, restitution in an amount to be determined at a later date, and the mandatory $100 special assessment for the count of conviction.

**I.      INTRODUCTION**

For weeks leading up to the January 6, 2021 attack on the United States Capitol, Denney, a former military police officer and the self-declared President of a militia group called the Patriot Boys of North Texas ("PBONT"), gathered protective gear and weapons, recruited comrades in arms, and arrived in Washington, D.C. eager for violence.  His stated purpose that day was to prevent Congress, by physical violence, from certifying that Joseph Biden had won the Electoral College vote two months earlier. Hellbent on achieving that unlawful and indeed unconstitutional result on January 6, Denney joined the storming of the police lines on the West Plaza and

1

Northwest Staircase of the U.S. Capitol, deploying pepper spray in the direction of officers, assaulting them – including with a pole -- and attempting to disarm them.   He then made his way to the Lower West Terrace of the Capitol building, the scene of some of the most barbaric violence on January 6. There, brandishing a baton or a stick, Denney joined in the mob's efforts to push their way through a line of police officers, including by pushing a riot shield into the officers, and shortly thereafter, swung at a police officer who had been separated from the police line. He still suffers from substantial physical injuries inflicted on him that day. All told, the attack on the Capitol forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[1]

Thereafter, Denney lied to FBI agents about his knowledge of the assault and deleted information from a social media account. Denny's service as a military police officer in the United States army makes his attack on the police who valiantly sought to protect the Capitol on January 6 more aggravating: he knew or should have known that his participation in the riot when thousands of persons, many armed with weapons, overran the vastly outnumbered police officers would result in numerous injuries to the officers.

As explained below, this Court should impose a substantial prison sentence in this case that takes into account all of Denney's violent, conspiratorial, and protracted criminal conduct on January 6.   The Government recommends that the Court sentence Denney to sentence of incarceration in the middle of the guideline range as calculated by the United States Probation

_____

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Department. Such a sentence is sufficient but not greater than necessary to meet the requirements of 18 U.S.C. § 3553(a), particularly considering the extent and seriousness of Denney's criminal conduct.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.

As set forth in the Pre-Sentence Report ("PSR"), a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings

underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* PSR ¶¶ 8-12.[2]

### Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.  Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police ("USCP")'s defenses until the building itself was accessible and the occupants were at risk.

---

[2] References to the PSR are to the draft Presentence Investigation Report, ECF 40.

The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Exhibit 1[3]: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds.   At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, in the Peace Circle, which led to the Pennsylvania

---

[3]  All exhibits will be provided to the Court and opposing counsel via USAfx.

Walkway.   Seeing this, a half dozen USCP officers began to gather behind what is labeled in Image1 as "1st Police Barricade," circled in red and marked as Area A.   At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier.   Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.   By 12:58 p.m., the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B in Image 1.   They flooded the area labeled "Lower West Plaza" Area C on Image1, pushing against the barricade there.



*Exhibit 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location

for less than a minute, pushing through and over the fence to the front of the plaza.   For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Exhibit 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).   In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.   At 2:03 p.m., Metropolitan Police Department (MPD) officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.   It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately.   This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.   On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.   Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.   By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.   As explained *infra*, Denney was among the rioters who violently participated in the attack on the officers on the West Front. With their defensive lines extinguished, several police officers were surrounded by the crowd.   The rioters had seized control of the West Plaza and the inauguration stage.   There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.



*Exhibit 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

***Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building***

> The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.

*Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT"). As explained *infra*, Denney was in the thick of that violence, working his way to the front of the mob to personally and forcefully contribute to it.

The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long (the "Tunnel"). That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the Tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building. This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day. Image 5; "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



*Exhibit 5*

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.   Members of the USCP, assisted by officers from the MPD, were arrayed inside the doorway and guarding the entrance.   Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at

the rioters, who continued to resist.   The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items.   Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.   At a later hearing on the events of January 6, Representative Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people.   And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me.   So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in.   That's about from the distance where I'm sitting here on the dais to that back wall.   And from that office in close proximity to where you all held the line, I listened to you struggle.   I listened to you yelling out to one another.   I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall.   And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight."   Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers. The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the previously-mentioned assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.   Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle.   *Id.* (Statement of Sgt. Aquilino Gonell)

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor.   MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service.   *Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5:00 pm.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area.   It is not an exaggeration to

state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). This Court has similarly described the riot as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters, like Denney himself, wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

## B.     Defendant's Role in the January 6, 2021 Attack on the Capitol

### *Preparations for January 6, 2021*

Throughout December 2020 and early January 2021, Denney used Facebook to recruit members to join the Patriot Boys of North Texas generally, to encourage others to join him in traveling to (and arming for) the "Stop the Steal" rally in Washington, D.C. on January 6, 2021, and to fundraise for weapons, gear, lodging, and travel.

In Facebook messages, Denney explained that PBONT, whose logos incorporate Three-Percenter[4] imagery, was "allied with the Patriot Prayer and the Proud Boys" and that he was

---

[4] Militia extremists sometimes call themselves three percenters ("III%ers" or "threepers") based on the myth that only three percent of American colonists took up arms against the British during the American Revolution. While many independent or multi-state militia groups incorporate III% in their unit names, the term is less indicative of membership in a single overarching group than it is representative of a common belief in the notion that a small force with a just cause can overthrow

"building other chapters now in west Texas, south Texas and Tennessee so far." PSR ¶ 19. Various iterations of the PBONT logo are depicted below:



Exhibit 6                                                    Exhibit 7

Denney also communicated with others about establishing a new Dallas chapter of the Proud Boys.   For example, on December 4, 2020, Denney explained his motivation in establishing and recruiting for his militia group, stating on Facebook:

> For me, it was really only a matter of time before I dusted off my boots. I've hunted the most evil men the world has ever seen and they didn't scare me. I loved it. The time is coming to choose a side. And they're 3 sides to choose from. The right side, the wrong side and the side where you aren't doing shit but sitting on the sidelines watching. DFW Proud Boys are now recruiting. We also have a few guys that are doing martial arts training, weapons training and field training. We are very active in countering ANTIFA, BLM and any other communist radical groups that decide to pop up. We also hold pro America rally's, pro Trump rally's and back the blue rally's. We show the communist that Patriots are here and not hiding. PM me for any questions you have about membership. "We Don't Back Down, We Take Care Of Our Own."

---

a government if armed and prepared. *See* https://www.splcenter.org/fighting-hate/extremist-files/group/three-percenters; https://www.adl.org/resources/backgrounders/three-percenters.

Exhibit 8[5]  at 1. Denney signed this message "President of the DFWPB chapter." *Id.*

Denney emphasized his (and PBONT's) connection to and affiliation with other extremist groups.   He boasted that he was going to meet with the chairman of the Proud Boys in Washington, D.C., on December 12, 2020.[6]   On December 7, 2020, Denney explained to another Facebook user:

> This weekend I'm actually headed to DC with a group to meet the PB chairmanand to join then [sic] on their March.   Which ANTIFA is already putting out flyers to counter us.   That will be a brawl and you'll probably see that on the news. . . . So if you're tired of sitting back and watching ANTIFA and BLM on TV destroying shit and want to be on the front lines doing something about it as a Patriot American, come on, brother.   Would love to have you.

Exhibit 8 at 2-3.   With respect to plans for January 6, 2021, he bragged to co-defendant Donald Hazard that "the 6th is going to be bigger than the last rally. I can't tell you everything I know over media here but it's gonna be big" and "We will need linking up with proud boys though. I've been in contact with a few different chapters and they're helping us out with safe hotels to get." PSR ¶ 15.

On or about December 28, 2020, Denney told Hazard that they would be "teaming up with thousands of others that will be in the same hotel and the one around it. I wish I could tell you more but I can't over messenger." PSR ¶ 17. Denney made reservations at a hotel in Washington, D.C. for the days around January 6, 2021, which he described to Hazard as "the same place everyone else is getting in the Proud Boys crew and other militia's until it gets full." *Id.*   He also told others on December 30, 2020 on Facebook that he had "plans to meet with about 1 thousand

---

[5] Excerpts from Denney's Facebook postings and messages.
[6] Denney was apparently unable to make the trip to due to traffic.

other guys that we are all in a Intel chatroom together" and spoke of "[h]aving to organize everything with my guys and linking with other militias across the US." *Id*. ¶ 21.

Denney bragged to one individual that "A lot of the Presidents and commanders of militias like myself are meeting on the 5th to organize and plan." PSR ¶ 23. Later in the conversation, Denney continued, "It's 209am.   I'm still up chatting with all my brothers that going to DC.   All the Presidents have been so busy organizing, planning and talking lol." *Id*.   Denney also stated "I'm in other chat groups and one for the president's of other groups and there are certain plans being made right now. It's gonna be historic is all I can say and we will be taking back the country on the 6th up there." PSR ¶ 24.   Denney also emphasized his military police training and his intent to obstruct the certification of the November 2020 election, stating:

> So Trump has called this himself. For everyone to come. It's the day the electoral college is suppose to be certified by congress to officially elect Biden. But, Pence is in charge of this and he's going to throw out all the votes from states that were proved to have fraud. There's so much more going on behind the scenes though. That's why he's called this rally for support. . . . Trump will stay President . . . . That's why I've been super busy. I'm the President of the Patriot Boys in North Texas and have over 200 guys. We are 3%ers. Since I'm retired from the military this is what I do mainly. Would love to have you go. If you want to just let me know.

PSR ¶ 21.

In a prescient message on January 1, 2021, Denney commented "I'm so pumped brother. I can't wait to be in the middle of it on the front line on the 6th." PSR ¶ 23. Later, on January 4, 2021, Denney also expressed his expectation for "civil war," claiming that "Ww3 isn't too far away though."   PSR ¶ 25.

On January 2, 2021, Denney sent a message on Facebook stating:

> I'm leaving Sunday for DC with my group. There's gonna be millions there. I can't tell you everything over Facebook here but I can say Trump will stay President and

18

the liberals and deep state Republicans are not going to win against the people. They rigged this election and that's no conspiracy theory and we ain't dumb. They think we are just going to roll over and let that happen. That's what they're hoping for anyways lol.

Exhibit 8 at 4.

That same day, Denney made the following comment on a post: "I'm hearing some bad stuff today about Pence. First everyone thought he was going to be a hero and now I'm hearing he's stabbing Trump in the back through backdoor deals. The 6th in DC is going to be interesting." Exhibit 8 at 5. He commented on another post that same day: "Me and my guys leave Sunday for DC to be in the fight on the 6th. It will get Western I can tell you that." Exhibit 8 at 6.

Consistent with his expectations of physical fighting on January 6, Denney specifically sought out individuals who would be willing to engage in violence to travel with him.   As he told Hazard over Facebook, "If you know any other guys that can go thats like us an will fight, we could use them.   And it will be paid for."   PSR ¶ 16. Denney expressed this sentiment to others as well.   Between December 26, 2020 and December 29, 2020, Denney sent the following Facebook messages to various other individuals (underline emphasis added):

- "You wanna to go DC with us brother? It's gonna be paid for if you can get off work. The rally on the 6th is going to be historic I promise you that. . . . If you know anyone like us that can go and will actually fight, then we could use them.   The trip is paid for."   Exhibit 8 at 7-8.

- "Going to DC if you can go it's paid for. . . . Leaving on the 4th. We'll be back here on the 8th. We are linking up with thousands of Proud Boys and other militia that will be there.   This is going to be huge.   <u>And it's going to be a fight</u>. . . . Everything is paid for through donations to our chapter . . . . Trump is calling this rally himself. It's the day that Congress is going to try and certify the electoral college. But pence can deny the ones coming from the states where fraud took place. So we are thinking Trump wants us there to keep the area from being burned down by ANTIFA thugs when they get mad . . . . Biden ain't getting into office." PSR ¶ 20.

- "Hey do you or do you know anyone that wants to go to DC with me and a few other

19

guys for the January 6th rally? <u>I need guys willing to fight ANTIFA back</u>. . . . Everything will be paid for . . . . We are meeting with thousands of other fighters." *Id.*

- "REMINDER: For everyone going to DC remember, no guns. They have strict weapon laws. Look them up before you go. <u>Pepper spray is legal though.</u>" PSR ¶ 21.

Denney also solicited donations to pay for the trip, including protective gear that he and others would need in anticipation of violent conflict.   On or about December 30, 2020, Denney sent the following requests, among others (emphasis added):

- "Hey can you or anyone you know donate to this chapter that isn't going to DC with us? I got the hotel rooms paid for. But <u>two of the guys that's going need helmets and vest and medical equipment.</u> If you know anyone we need donations by Friday. We are leaving Sunday." PSR ¶ 21.

- "If you know anyone else that can donate let me know about us. <u>I still need to get some more protective gear for some more of my guys</u> and other supplies before we leave Sunday." PSR ¶ 19.

- "I'm still trying to take donations to get <u>two helmets and stab proof vest</u> that two guys need.   <u>And medical supplies.</u>" Exhibit 8 at 9.

To one Facebook user who asked Denney what his group needed for January 6, Denney replied on December 30, 2020:   "2 helmets, 3 stab proof vest, cans of pepper spray, medical supplies and gloves. And our own food and water because places might get shut down. . . . If I have enough left over I'll need to get batteries and a few more communication radios (walkie talkies)".   Exhibit 8 at 10-11. Denney told that same user that he had already "bought a couple cans of pepper spray earlier and one vest" but that he still needed "two more vest, two helmets, two more cans of spray, two more radios and medical supplies."[7] Exhibit 8 at 12.   He also explained that he was able to

---

[7] When this individual inquired as to whether Denney and his associates would able to use the vests on other occasions, Denney responded "Oh we will definitely be back on the 20 [Inauguration Day] with whatever happens."

use his military discount to buy vests for $80, which was "actually a good price . . . because they go up to $200 a piece with armor plating."   Exhibit 8 at 13.

       In particular, Denney encouraged Hazard to obtain protective gear and weapons and assisted him in doing so.   On or about December 25, 2020, he sent a message to Hazard asking him to travel with him to Washington, D.C. and appointing Hazard "sergeant at arms." PSR ¶ 15. Denney explained that "An SA watches the president's back. Kinda like security." *Id*.   A few days later, on or about December 30, 2020, Denney messaged Hazard stating, in relevant part, "I want to pick you up and take you to get a helmet and pick up some other gear. . . . We have 3 guys so far. But we are meeting hundreds of others at our hotel."[8] PSR ¶ 18. Later, Denney informed Hazard that Denney had "picked us each up a bottle of police grade pepper spray from the Fort Worth Police Store . . . . I'm gonna have [sic] you a vest too."[9]   *Id*.   The next day, Denney reiterated to Hazard that they had "to go out tomorrow and get you a helmet for yo head." *Id.*

       Denney's expectations of violence became a reality even before the afternoon of January 6, 2021.   According to Denney's own statements, on the evening of January 5, 2021, Denney and others ventured to Black Lives Matter Plaza in Washington, D.C. where, according to Denney,

> [W]e started fighting.   It was crazy.   We made it back to the hotel safe and ready
> for tomorrow.   Trump speaking to us around 11 am then we march to the capital

---

[8] On January 3, 2021, Hazard informed another Facebook user, "I'm ready. I got a helmet today I got knuckle gloves I got goggles I got a body armor" and sent pictures of hard knuckled gloves and a helmet to that user.

[9] When Hazard was interviewed by the FBI following his arrest on December 13, 2021, he informed agents that Denney had provided him and another individual with whom they travelled with walkie talkie radios to use during the rally and that, on January 6, 2021, he had worn body armor that Denney had loaned to him.

and after that we have special plans that I can't say right now over Facebook.   But keep an eye out for live feed tomorrow from me.   Tomorrow will be historic.

PSR ¶ 26. That same night, Denney told one Facebook user "Things got crazy at BLM plaza. I posted video Sorry for the cussing in it but that's what happens when you get into that warrior mode" and told another Facebook user, "You'd be getting you some blood here. Good night. Check out the live feed I made before we started fighting." Exhibit 8 at 14-15.   Likewise, shortly thereafter, he told another user, "Things got crazy at BLM plaza tonight" and "Tomorrow is going to be a historic day so keep an eye on my Facebook for live videos. I'll do them the best I can when we're not fighting." Exhibit 8 at 16.

### *Denney's Numerous Assaults of Law Enforcement at the U.S. Capitol*

Denney's predictions of violence proved correct.   On January 6, 2021, Denney was clad in full battle attire, wearing at various times, a helmet, knuckled gloves, and what appears to be a ballistic vest with body armor under his jacket.    He also at times wore a black baseball cap, a shirt or jacket with camouflage-patterned sleeves and a three-percenter patch, and a joker-grin neck gaiter.   For more than an hour and a half, Denney repeatedly confronted police officers protecting the Capitol.   This violent conduct is documented in body worn camera ("BWC") footage from the Metropolitan Police Department, open-source video, and surveillance footage from inside of the Capitol building.

<u>Denney's Sustained Attacks On the Police At The West Plaza</u>

By approximately 1:30 p.m., Denney had entered the restricted grounds of the Capitol and approached the police line protecting the west side of the Capitol. Metal bike-rack barricades separated the crowd and the police officers.    At approximately 1:37 p.m., Denney approached the line of police officers and began yelling words to the effect of "Who y'all protecting?   Who are

you all protecting?". Denney then reached out and grabbed one of the metal barricades and attempted to pull it away from the officers standing behind it.   *See* Exhibit 9.[10]



*Exhibit 9A*

---

[10] Footage from MPD Officer T.T.'s BWC, 13:37:11-13:37:40



*Exhibit 9B*

Officers pulled the barrier back and Denney then lunged forward, kicking at the barrier, as depicted

below:



*Exhibit 9C*

After apparently being sprayed by crowd-control spray, Denney ran away from the barrier, yelling "Fuck you! Fuck you!" and raised his middle finger.   Appoximately two minutes later, at 1:39 p.m., Denney rattled the metal barrier and then again attempted to rip the barrier away from the officers.   *See* Exhibit 10.[11]



*Exhibit 10A*

When unsuccessful, Denney moved slightly south to another barricade and again attempted to pull the barricade away from and into the officers protecting the Capitol:

---

[11]   Footage from MPD Sgt. K.K.'s BWC, 13:39:30-13:39:48.



*Exhibit 10B*



*Exhibit 10B (zoomed in)*

A short time later, Denney was positioned underneath the scaffolding covering the Northwest stairs of the Capitol, leading from the West Front to the Upper West Terrace.   The top of the stairs were guarded by a line of USCP officers behind a metal barricade; rioters were attempting to break through.   Exhibit 11[12] depicts Denney emerging from the mob and spraying a substance – likely pepper spray – at the line of USCP officers, then retreating back into the crowd:



*Exhibit 11A*

---

[12]  Exhibit 11 is an excerpt from a 1 hour, 26 minute, 15 second video posted to YouTube with the title "Full Video The Seige On United States Capitol," available at https://www.youtube.com/watch?v=Dg4HAVjykXE.   Exhibit 11 does not have a time stamp. However, it appears that Denney's deployment of spray against the officers occurred approximately six minutes before the police line at the top of the steps was breached. According to timestamped USCP surveillance video, that breach occurred at approximately 2:09 p.m.



*Exhibit 11B*

By 2:09 p.m., Denney and Hazard had relocated on the west side of the Capitol.   Denney approached a metal barricade, then, after being sprayed with crowd-control spray, backed up into the crowd.   Denney and Hazard, along with other rioters in the crowd, were yelling at the police officers guarding the Capitol building.   *See* Exhibit 12.[13]

---

[13] Footage from MPD Officer D.P.'s BWC, 14:09:50-14:10:50.



*Exhibit 12A*

Shortly thereafter, at approximately 2:14 p.m., Denney grabbed and shoved a police officer on the west side of the Capitol.   *See* Exhibit 13.[14]



*Exhibit 13A*

---

[14]  Footage from MPD Sgt. K.K.'s BWC, 14:13:48-14:14:25.



*Exhibit 13A (zoomed in)*

In a similar location, Denney and Hazard were captured on video advancing towards the line of police officers, each with an arm raised, holding what appear to be cannisters of pepper spray.   After a few seconds, Denney threw his cannister in the direction the line of officers.   *See* Exhibits 14[15] and 15.[16]

<hr/>

[15] Exhibit 14 is an excerpt from a video that was obtained from the cellphone of another rioter and does not contain a timestamp.

[16] Exhibit 15 is an excerpt from a 20 minute, 19 second video posted to YouTube with the title "Capitol Protest in Washington, D.C. on January 6, 2021," available at https://www.youtube.com/watch?app=desktop&v=9mt8YGpJ5vs.   That video does not have a timestamp.   While the footage in the full video is not continuous; the relevant portion appears to



*Exhibit 14A*

---

depict events on the West Plaza between approximately 2:03 p.m. and at least 2:23 p.m.



*Exhibit 14A (zoomed in)*



*Exhibit 15A*



*Exhibit 15A (zoomed in)*

By at least 2:23 p.m., Sgt. K.K. had assumed a position on an elevated structure between the crowd and the west side of the Capitol building.   The rioters below were throwing debris at police officers, including Sgt. K.K., who was armed with crowd-control spray and occasionally used it to repel the rioters.   Denney worked his way through the crowd and attempted to grab the canister of crowd-control spay away from Officer K.K.   *See* Exhibits 15 and 16.[17]

---

[17] Footage from MPD Sgt. K.K.'s BWC, 14:23:21-14:24:05



*Exhibit 16A*                                    *Exhibit 16B*





*Exhibit 15B*                                    *Exhibit 15C*



*Exhibit 15D*

Sgt. K.K. then deployed the crowd-control spray and Denney retreated into the crowd. Less than a minute later, Denney picked up a long pole from the ground which he swung towards Sgt. K.K.  *See* Exhibits 15 and 16.



*Exhibit 16C*



*Exhibit 16D*

Sgt. K.K. and several other officers attempted to pull the pole away from Denney and the other rioters but were ultimately unsuccessful.   *See* Exhibit 17.[18]

---

[18]  Exhibit 17 is an excerpt from a 10 minute, 22 second January 6 compilation video located at: https://vimeo.com/498659551/080427b8cf entitled, "Capitol Insurrection." The journalist, J.H., who filmed the video and created the compilation was also struck in the head and shoulder by the pole wielded by Denney.



*Exhibit 17A*

Less than a minute later, at approximately 2:24 p.m., Denney and another rioter grabbed what appears to be a large tube and launched it toward the line of police officers guarding the west side of the Capitol building.   *See* Exhibit 18.[19]

---

[19] Exhibit 18 is a video that had been posted on YouTube, but has since been taken down.   It does not contain a timestamp, however a comparison to Sgt. K.K.'s BWC indicates that the events occurred at approximately 2:24 p.m.



*Exhibit 18A*           *Exhibit 18B*           *Exhibit18C*

<u>Denney's Attacks On the Police On The Lower West Terrance And Tunnel</u>

By approximately 3:12 p.m., Denney relocated to the LWT.   By that time, the crowd of rioters had already advanced part of the way into the Tunnel, which was guarded by a line of police officers.   The crowd was collectively pushing against the officers – at times rocking together in a coordinated fashion – in an effort to breach the line of officers and gain entry to the interior of the Capitol building.   Denney entered the Tunnel and joined the crowd, waving his hand forward in encouragement.   *See* Exhibit 19.[20]

---

[20] CCV footage of the entrance and inside of the Tunnel.



*Exhibit 19A*

By approximately 3:14 p.m., as multiple other rioters exited the Tunnel, Denney had pushed himself farther into the Tunnel, carrying what appears to be a baton or stick in his hand.



*Exhibit 19B*



*Exhibit 19C*

At approximately 3:15 p.m., Denney and another rioter pushed a riot shield into and on top the line of officers for more than a minute, as the crowd of rioters rocked back and forth chanting "heave ho!" and pressing against the line of officers.  *See* Exhibits 20[21] and 21.[22]

---

[21] Exhibit 20 is an excerpt from a 29 minute, 22 second video posted to YouTube with the title "UNBELIEVABLE Footage | Trump Supporters Battle Cops Inside the Capitol," available at https://www.youtube.com/watch?v=cJOgGsC0G9U.   The video is not timestamped, but based on a comparison to the BWC footage of MPD officers in the Tunnel, the relevant portion appears to depict the time period from approximately 3:15 p.m. to 3:18 p.m.

[22] Exhibit 21 is a still image from footage from MPD Officer J.A.'s BWC.



*Exhibit 20A*



*Exhibit 20B*



*Exhibit 20C*



*Exhibit 20D*



*Exhibit 21A*

At approximately 3:18 p.m. rioters had pulled a police officer – Officer M.F. – off of the police line. As other officers were pushing rioters from the Tunnel, the rioters pulled Officer M.F. out of the Tunnel and into the crowd on the LWT.   As Officer M.F. was pulled into the crowd and down the steps, Denney gestured towards others in the crowd.   *See* Exhibit 22.[23]

---

[23]  Exhibit 22 is a 3 minute, 4 second video posted to YouTube with the title "POLICE OFFICER ENGULFED IN CROWD / THE STORM ARRIVED PT. 5" available at https://www.youtube.com/watch?v=9rOKpUkiOW4.



*Exhibit 22A*

Denney then turned towards Officer M.F., swung his arm and fist at M.F., and grabbed at M.F., in an apparent attempt at pulling him farther down the stairs, as depicted below.   Denney then himself fell backwards into the crowd.   See Exhibits 22 and 23.[24]   In the exhibits below, Denney is circled in red; Officer M.F. is circled in yellow.

---

[24] Exhibit 23 is footage from a video recorded by an individual in the crowd using a Go-Pro device.

45

 

*Exhibit 23A*                    *Exhibit 23B*

<u>The Officer's Injuries</u>

Sgt. K.K. has informed the Government that he sustained bruising on January 6, 2021, including bruising consistent with being hit by a pole, though he is unable to attribute the bruising to the acts of a particular individual or individuals.

### *Denney's Post-January 6 Conduct*

In the days following January 6, 2021, Denney posted statements on Facebook regarding his participation in the riot and expressing concern that his and Hazard's criminal conduct might be detected by law enforcement officials.   From January 7, 2021 through on or about January 13, 2021, Denney made the following comments or sent the following messages, among others, on Facebook:

- I know I heard a bunch of ANTIFA was in the crowd wearing MAGA hats or other clothes that aren't all black. Now there were a lot of Patriots pushing back on the police riot shields trying to get through. But that was intentionally and unnecessarily started by a few of the police when they started throwing gas and flash bangs at the crowd that were just there yelling. There was women and children in the crowd. No one from what I seen was trying

to go over barricades at that time. The whole thing was instigated on purpose. Exhibit 8 at
17-18

- The whole Capitol building thing was a set up. It was peaceful. The police even opened up
  the barricades to let people come closer. The protesters were still peaceful at the second
  barricades when the Capitol police started firing flash bangs and gas into the crowd. It was
  a total set up. *Id*. at 19.

Denney also described Vice President Pence as a "traitor" and told other Facebook users that the

events at the Capitol were "a set up." *Id*. at 19-20.

On or about January 9, 2021, Denney messaged Hazard on Facebook, stating "remember

to keep quite [sic] this week."   *Id*. at 21.   On January 13, 2021, Hazard asked Denney to return

his gun to him, stating "I've been stressing not having a gun in the house. Especially in these

times." *Id*. at 22. Later in the conversation, Denney stated "Great. See you tonight. Remember

don't talk about certain things to anyone. You know what I mean" to which Hazard responded

"Yep I know exactly what you mean." *Id*.

On February 26, 2021, Denney and another individual voluntarily met with agents of the

FBI.   During that meeting, Denney stated he did not know anyone who went into the U.S. Capitol

building on January 6, 2021. Denney falsely claimed he did not know of anyone who traveled to

Washington, D.C. to go into the U.S. Capitol.   Denney claimed that he had seen on social media,

probably in December 2020, discussions of people who wanted to travel to Washington, D.C. to

attend the Trump rally and believed he saw postings on Facebook regarding the rally. He also

falsely stated he did not personally know anyone who traveled to the rally.

On August 26, 2021, in a video posted to Tik Tok, Denney expressed violent anti-

Government, anti-law enforcement views, stating in part:

Big shoutout to the FBI because you're fucking traitors. FBI, you're on the wrong
fucking side, you're on the wrong fucking side of this. . . . I'm calling for a military

coup. . . . Go ahead and do a military coup and get this motherfucker out of office, these communists out of office, and you need to get Trump back in there to fix this shit.

Exhibit 24 at 00:52-1:26.

Denney also stated that if Donald Trump were not reinstated as president, the United States will face "World War III and a civil war all at once. The worlds fucking blowing up. Get these motherfuckers out of office now." *Id*. at 1:35-1:51.

Denney was interviewed again by the FBI following his arrest in December 2021. During that interview, Denney falsely stated that he did not see any fights or riots at the Capitol building and that he could not remember striking or "laying a finger" on anyone, although he could have pushed someone back or bumped into an officer. He did admit to throwing a cardboard tube "into the crowd."

## III.    THE CHARGES AND GUILTY PLEA

On December 7, 2021, Denney was charged by complaint with violations of 18 U.S.C. §§ 111(a)(1) and (b) and 2 (Assaulting, Resisting, or Impeding Certain Officers or Employees and Using a Deadly or Dangerous Weapon or Inflicting Bodily Injury); 18 U.S.C. § 231(a)(3) (Obstruction of Law Enforcement During Civil Disorder); 18 U.S.C. § 1512(c) and (k) (Obstruction of an Official Proceeding and Conspiracy to Obstruct an Official Proceeding); 18 U.S.C. §§ 1752(a)(1), (2), (4) and (b)(1)(A) (Knowingly Entering or Remaining in any Restricted Building or Grounds with a Deadly or Dangerous Weapon, Disorderly and Disruptive Conduct in any Restricted Building or Grounds with a Deadly or Dangerous Weapon, and Engaging in Physical Violence in any Restricted Building or Grounds with a Deadly or Dangerous Weapon); and 40 U.S.C. § 5104(e)(2)(F) (Violent Entry and Disorderly Conduct on Capitol Grounds).

48

Denney was arrested on December 13, 2021 and presented in the Western District of Texas, where he was ordered detained pending trial on December 17, 2021.

On March 2, 2022, Denney filed a motion for release from custody, based on the Government's failure to conduct a preliminary hearing within 14-days of his initial appearance in the Western District of Texas where he was arrested.  Subsequently, on March 5, 2022, Denney filed a motion for release from custody and to dismiss the complaint on the grounds that the Government had failed to file an information or indictment within the 30-day time period provided by 18 U.S.C. § 3161(b).

On March 7, 2022, a federal grand jury returned an indictment charging Denney with one count of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b).   On March 17, 2022, Denney pled guilty to the Indictment without a plea agreement.

## IV.    STATUTORY PENALTIES

The defendant now faces sentencing on Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b).   As noted by the U.S. Probation Office (the "Probation Office") in the PSR and in the Government's notice filed prior to the defendant's guilty plea (ECF No. 33), Denney faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should

be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

Offense Level

The Government agrees with the Sentencing Guidelines calculation set forth in the PSR.[25] In the PSR, the Probation Office calculated the defendant's offense level as 29, applying the following enhancements to a base offense level of 14 (U.S.S.G. § 2A2.2(a)):

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(1) | The offense involved more than minimal planning | +2 |
| U.S.S.G. § 2A2.2(b)(2)(B) | The defendant used a dangerous weapon (a pole) | +4 |
| U.S.S.G. § 2A2.2(b)(7) | The defendant was convicted of a violation of § 111(b) | +2 |
| U.S.S.G § 3A1.2(b) | Official victim | +6 |
| U.S.S.G. § 3B1.5(2)(B) | Use of body armor during the commission of a crime of violence | +4 |
| U.S.S.G. § 3E1.1(a) & (b) | Acceptance of responsibility | -3 |

PSR ¶¶ 57-70.

---

[25] Based on the facts and circumstances of Denney's case, the Government does not seek imposition of an upward departure pursuant to U.S.S.G. § 3A1.4, n.4 because a sentence within the Guidelines range as determined in the PSR is sufficient, but not greater than necessary, to comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2).

Denney's Guideline analysis (ECF No. 29), submitted prior to his change of plea hearing and prior to the preparation of the PSR, does not include enhancements pursuant to the following provisions: more than minimal planning (U.S.S.G. § 2A2.2(b)(1)), use of a dangerous weapon (U.S.S.G. § 2A2.2(2)(B)),[26] and use of body armor during the commission of a crime of violence (U.S.S.G. § 3B1.5(2)(B)).[27]   For the reasons set forth below, the facts of this case support the application of each of these enhancements.

       1.   *U.S.S.G. § 2A2.2(b)(1)*

As used in Section 2A2.2(b)(1), "more than minimal planning" means "more planning than is typical for commission of the offense in a simple form." U.S.S.G. § 2A2.2, cmt. n. 2. *See United States v. Coombs*, 823 F. App'x 613, 617 (10th Cir. 2020) (unpublished) ("the simple form of his crime required only that on a particular date, at a particular location, he knowingly assaulted another individual with a dangerous weapon with the intent to do bodily harm"). Here, as detailed above, Denney went to great lengths to prepare for January 6, 2021, including the possibility that he would encounter and engage in violence that day.   He recruited others, including Hazard, to join with him in traveling to Washington D.C. to attend the Stop the Steal rally, and fundraised in order to procure supplies for them, including helmets, vests, pepper spray, and medical supplies. Denney specifically appointed Hazard to act as his "sergeant at arms," or head of security, in order to "watch[] [his]back."   In other words, Denney intended to engage in violent, assaultive conduct in Washington, D.C., and in the weeks prior to January 6, 2021, made and executed plans to both

---

[26] Instead, the defendant argues that he "brandished" a dangerous weapon, resulting in a 3-point enhancement pursuant to U.S.S.G. § 2A2.2(b)(2)(C).   *See* ECF No. 29 at 3.

[27] The Government's Guideline analysis (ECF No. 31), also submitted prior to the change of plea hearing and the preparation of the PSR, also did not include this enhancement.

arm and secure himself and those accompanying him.   This is more planning that went into many of the assaults committed by rioters at the Capitol on January 6 and is certainly a higher level of planning than goes into many, more typical assaults. *See Coombs,* 823 F. App'x at 617 (affirming application of the enhancement even though "aggravated assault is not 'complicated criminal activity.' What matters is whether Coombs more than minimally planned his assault of M.C, not whether his offense was 'complicated.'"); *United States v. Sandoval*, 325 F. App'x 828, 830 (11th Cir. 2009) (unpublished) ("There was more than minimal planning [where] … substantial planning proceeded the drive-by-shooting of the rival members house [which was] more planning than would be involved in a 'simple form' drive-by-shooting").

### 2.   U.S.S.G. § 2A2.2(b)(2)(B)

Under U.S.S.G. § 2A2.2(b)(2), to "brandish" a weapon "means that all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person."   U.S.S.G. § 1B1.1, cmt. n.1(C); § U.S.S.G. 2A2.2 cmt. n.1.   In contrast, to "otherwise use" a weapon "means that the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon." U.S.S.G. § 1B1.1, cmt. n.1(J); § U.S.S.G. 2A2.2 cmt. n.1.   Here, Denney did more than display or threaten the use of a weapon.   Exhibits 16 and 17 show him swinging a pole at Sgt. K.K., making contact, and then pushing on Sgt. K.K. as they struggle over the pole.   The 4-point enhancement, not 3 points, should therefore apply.

### 3.  U.S.S.G. § 3B1.5

A 4-point enhancement pursuant to U.S.S.G. § 3B1.5(2)(B) applies if the defendant was convicted of either a drug trafficking offense or a crime of violence, and the defendant "used body armor during the commission of the offense, in preparation for the offense, or in an attempt to avoid apprehension for the offense."   A violation of 18 U.S.C. § 111(a)(1) and (b) is a crime of violence.   *See* 18 U.S.C. § 16(a) (defining "crime of violence" to mean an offense "that has as an element the use, attempted use, or threatened use of physical force against the person or property of another"); U.S.S.G. § 3B1.5, cmt. n.1.   "Body armor" is "any product sold or offered for sale, in interstate or foreign commerce, as personal protective body covering intended to protect against gunfire, regardless of whether the product is to be worn alone or is sold as a complement to another product or garment," *id.*; a defendant "uses" body armor when he wears it as protection against gunfire, regardless of whether gunfire is actually directed at the defendant.  *United States v. Johnson*, 913 F.3d 793, 803 (9th Cir.) (enhancement properly applied where defendant was wearing body armor during a traffic stop while he possessed drugs; although mere possession is insufficient, "[t]here is no reasonable way to construe this language that would exclude wearing body armor from the definition of 'use.'"), *cert. granted, judgment vacated on other grounds*, 140 S. Ct. 440 (2019). And as this Court is well-aware, "long-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proved by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction." *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) (internal citations omitted).

53

In video and photographic footage from January 6, Denney is wearing what appears to be wearing a protective vest underneath his shirt.   For example, in Exhibits 9C and 15D, discussed above, and Government Exhibit 24, there appears to be something hard and molded underneath Denney's outer layer:



*Exhibit 9C*



*Exhibit 15D*






*Exhibit 24*                         *Exhibit 24A (zoomed in)*

This is consistent with Denney's discussions regarding purchasing "vests" for him and his associates to wear on January 6, detailed above.

Although the Government was not able to obtain the protective vest Denney wore on January 6 through search warrants or otherwise, Denney's messages indicate that the vest was, in

fact, body armor, that is, intended to protect the wearer from gunfire.   As he told one Facebook user, vests "with the armor plating" are expensive, but he was able to get a "good price" with his "military discount."   And, while Denney professed to need the vests to "protect from being stabbed," it stands to reason that the son of a veteran police officer who served in the military police who violently engaged with armed police officers protecting the Capitol (and who, the day before had gone into "warrior mode" at Black Lives Matter Plaza) would anticipate the possibility of gunfire as well.   *See Johnson*, 913 F.3d at 803 ("Wearing body armor is the precise means by which a person 'employ[s] [the body armor] in a manner to protect the person from gunfire.'"); *United States v. Barrett,* 552 F.3d 724, 728 (8th Cir. 2009) ("The ability of body armor to serve dual purposes does not make § 3B1.5 inapplicable where the facts show one purpose could be to protect the wearer from gunfire."); *United States v. Haynes*, 582 F.3d 686, 712 (7th Cir. 2009) (finding, in the context of a police officer involved in "rip offs" of narcotics trafficker who claimed that he wore his bulletproof vest in order to indicate to victims that he was a law enforcement officer, that "[t]e court drew the reasonable inference that the body armor was being used for its primary purpose—for protection"), *abrogated on other grounds, by United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012).   The Court should therefore apply the 4-point enhancement.

At the very least, the 2-point enhancement under U.S.S.G. § 3B1.5(2)(A) applies because "the offense involved the use of body armor." "Offense" in that context "has the meaning given that term in Application Note 1 of the Commentary to § 1B1.1 (Application Instructions)." U.S.S.G. § 3B1.5, cmt., n. 1. That "means the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1, cmt., n. 1(i). "Relevant conduct" includes:

56

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—

(i) within the scope of the jointly undertaken criminal activity

U.S.S.G. § 1B1.3(a)(1)(B). As noted above in footnote 9, Hazard informed the FBI that on January 6, he had worn body armor that Denney had loaned to him. Hazard's admitted wearing of body armor he obtained from Denney is plainly part of Denney's relevant conduct, and therefore supports the application of the 2-level enhancement under § 3B1.5(2)(A), even if this Court concludes that the Government has not proved by a preponderance that Denney personally wore body armor that day.

Criminal History

The Probation Office calculated the defendant's criminal history as Category I, which is not disputed. PSR ¶ 56.

Accordingly, based on the Probation Office and the Government's calculation of the total adjusted offense level, after acceptance of responsibility, at 29, Denney's Guidelines imprisonment range is 87 to 108 months' imprisonment.

## VI. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,

§ 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While assessing Denney's criminal conduct on January 6, this Court should look to a number of critical aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise

exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of Denney's crimes weigh heavily towards a significant term of incarceration.   Denney's statements prior to the riot demonstrate that his intentions in traveling to Washington, D.C. were not simply to protest.   Rather, he was prepared for (and excited by the prospect of) violence.   As he posted on Facebook, "This is going to be huge.   And it's going to be a fight. . . . . Trump is calling this rally himself. It's the day that Congress is going to try and certify the electoral college."   To that end, he solicited donations, not only for travel and lodging expenses, but for protective gear, weapons, and medical supplies.   And, in addition to his own preparations for violence, he facilitated and encouraged others' as well.

Upon arriving in Washington, D.C., Denney almost immediately sought out violent conflict.   Far from being dismayed by the conflict in Black Lives Matter Plaza on January 5, he returned to his hotel excited about "fighting" and "blood," looking forward to "march[ing] to the capital" on January 6 with "special plans" that he did not want to talk about over Facebook, and promised to update others on the day's events "when we're not fighting."

Upon arriving at the Capitol grounds on January 6, Denney violently engaged with police officers on the West Plaza for at least 45 minutes.   There, he attempted to forcibly remove metal barricades, pulling them away from and shoving them at police officers.   He deployed pepper spray in the direction of officers on at least two occasions.   He physically and violently confronted officers, shoving them, swinging and throwing objects at them, and attempting to disarm them.

Not content to remain on the outside of the Capitol building, Denney, armed with a baton or a stick, then joined an effort to break through the police line that was stationed in the LWT

Tunnel and encouraged others to join him.   While other rioters exited the Tunnel, Denney made his way to the front of the mob, directly up against the line of officers.   There, he and other rioters pushed a riot shield into and on top of the officers for more than a minute, crushing the officers between the mob and the rest of the police line.   After one of the officers – Officer M.F.—was pulled off of the line by other rioters and out onto the steps leading up to the Tunnel, Denney himself took a swing at him and then attempted to grab him, in an apparent attempt to pull him farther into the armed mob.

Additionally, although Denney has not been convicted of violating 18 U.S.C. § 1512(c)(2) for obstructing a proceeding before Congress—the certification of the 2020 Electoral College vote for President—Denney's own statements could not more clearly establish that his purpose in traveling to Washington D.C. and participation in the riot was to prevent the peaceful transition of President power. Thus, the Sentencing Guidelines does not reflect his criminal obstructive intent. But this Court can and should consider that intent under 18 U.S.C. § 3553(a)(1) and treat it as an additional aggravating circumstance that supports a substantial sentence in this case.

The defendant's actions on January 6 show an absolute disregard for the rule of law coupled with a willingness to incite and engage in violence.   His actions show a willingness to violate the law, to engage in acts of disorder and violence, and to harm others, including uniformed law enforcement.

After the riot, Denney attempted to downplay the violence that occurred at the Capitol, calling it a "set up" and stating falsely that the crowd was "peaceful" until the USCP "started firing flash bangs and gas into the crowd."   Nevertheless, he recognized the illegality and seriousness of his actions and instructed Hazard to stay quiet and not to "talk about certain things to anyone."

Indeed, when he was voluntarily interviewed by the FBI in February 2021, he falsely claimed that he did not know anyone who traveled to the rally in Washington, D.C.   Denney's failure to admit his involvement in the violence at the Capitol continued through December 2021, when he told FBI agents that he did not remember striking or laying a finger on anyone on January 6 and did not see any fights or riots at the Capitol building.

The seriousness of this offense including the defendant's incitement of the mob violence and assaults on multiple police officer, demands a lengthy sentence of imprisonment.

### B.  The History and Characteristics of the Defendant

Denney is a former Military Police Officer.   While his military service is commendable, his experience should make clear to him the very real danger posed by an armed mob attacking a vastly outnumbered police force protecting the Capitol.   Moreover, his conduct on January 6, 2021, and in the weeks prior, as well as his violent rhetoric, demonstrates a violent character and disrespect for law enforcement, despite his lack of prior criminal convictions.   Indeed, Denney, a disabled military veteran who since 2007 has not worked and has received monthly military benefits, used his time leading up to January 6 to create and lead an organization opposed to the same government he swore to protect. This factor weighs in favor of a lengthy sentence.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly

administration of the democratic process."[28]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Denney's criminal conduct, assaulting police officers, with the goal of corruptly obstructing of an official proceeding, is the epitome of disrespect for the law. When Denney entered the Capitol grounds, it was abundantly clear to him that lawmakers and the police officers who tried to protect them were under siege. Police officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could undermine public respect for the rule of law and encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.      The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving

---

[28] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                              at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

domestic terrorism, which the breach of the Capitol certainly was.[29] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by this Court during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

---

[29] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. First, although Denney has a criminal history category of I, his conduct on January 6, 2021, was premediated and was meant to disrupt the orderly transition of power.   In short, it was egregious.

Second, although Denney has now accepted responsibility by pleading guilty, his social media statements following January 6 were those of someone minimizing what he had done and girding for another battle.   To this day, Denney has not expressed any remorse, much less sincere remorse for this criminal conduct on January 6. To the contrary, he has doubled down on that conduct. After the riot, he falsely disclaimed to the FBI any knowledge of violence on the Capitol grounds or his role in it.

Consequently, this Court should take any expressions of remorse that Denney might offer at his sentencing hearing with a fair measure of skepticism.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Denney's own statements in August 2021 calling for a military coup if Trump were not reinstated as president demonstrate that this defendant's sentence must be sufficient to provide specific deterrence from committing future crimes of violence.

E.       The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's

recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the Government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F. Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. Mechanical comparison to assault cases in other non-January 6 contexts would be a disservice to the magnitude of what the riot entailed and signified, because these crimes defy comparison to other obstructive and assaultive conduct in other contexts. January 6 police officer assault cases that have already proceeded to sentencing provide helpful reference points.

As of the date of this sentencing memorandum, several Capitol Riot defendants have been sentenced for assaulting law enforcement officers. The conduct in this case is more egregious than in all of those other cases.

*United States v. Fairlamb*, 21-cr-120-RCL. Fairlamb armed himself with a police baton and incited violence outside of the Capitol. He was one of the very first rioters inside of the Capitol, and he entered the Capitol brandishing a weapon. Fairlamb also assaulted an MPD officer

by shoving the officer and punching the officer's face shield.   On another occasion, Fairlamb also assisted police officers, telling other rioters to leave them alone and assisting them in relocating to another area.   Fairlamb pled guilty to two counts: violations of 18 U.S.C. §§ 1512(c) and 111(a). In that case, the Government requested 44 months' imprisonment.   The Court imposed a 41-month sentence.

*United States v. Languerand*, 21-cr-353-JDB.   Languerand threw multiple objects at the police officers guarding the Capitol in the Lower West Terrace Tunnel, and afterwards bragged on social medial about his role in the riot.   When Languerand's room and trailer were searched, law enforcement officers found a large number of weapons, as well as notebooks containing militaristic language seemingly referring to Washington, D.C.   Languerand pled guilty to one count: a violation of 18 U.S.C. § 111(a)(1) and (b).   In that case, the Government recommended a sentence of 51 months' imprisonment.   The Court imposed a 44-month sentence.

*United States v. Thompson*, 21-cr-461-RCL.   Thompson and other rioters fought law enforcement officers in the LWT Tunnel for approximately 13 minutes.   Specifically, Thompson encouraged other rioters, threw objects at officers, and hit one officer on the hand with a metal baton causing a bruise.   Thompson self-surrendered and agreed to plead guilty to one count prior to his arrest or formal charging: a violation of 18 U.S.C. § 111(a)(1) and (b).   In that case, the Government recommended a sentence of 48 months' imprisonment, in part based on Thompson's turning himself in and then cooperating with the Government by providing information at multiple debrief meetings, prior to accepting a plea offer.   The Court imposed a 46-month sentence.

*United States v. Creek*, 21-cr-645-DLF.   Creek's conduct included shoving one police officer back several feet before striking that officer on the face shield portion of his helmet and

pushing a second police officer down then kicking him.   Creek brought first-aid supplies, mace, a knife, binoculars, and a radio with him on January 6.   Creek pled guilty to one count: a violation of 18 U.S.C. § 111(a)(1).   In that case, the Government recommended a sentence of 27 months' imprisonment.   The Court imposed a 27-month sentence.

*United States v. Wilson*, 21-cr-345-RCL.   Over the course of approximately 14 minutes, Wilson prevented officers from closing the doors in the LWT Tunnel, allowing other rioters to pry them open and attack officers.   Then, Wilson punched police officers, attempted to take their shields, threw objects at them, and struck at officers with a PVC pipe.   Wilson pled guilty to two counts: violations of 18 U.S.C. §§ 1512(c) and 111(a).   In that case, the United States recommended a sentence of 46-months incarceration, crediting Wilson with being the third Capitol riot defendant to enter a guilty plea to a felony charge.   The Court imposed a 51-month sentence.

*United States v. Palmer*, 21-cr-328-TSC.   On the LWT, Palmer threw a wood plank at officer, then deployed the contents of a fire extinguisher directly into the Tunnel and threw the empty extinguisher at the officers.   For the next several minutes, Palmer continued to push and throw objects at the officers in the Tunnel.   Later, on the Upper West Plaza, Palmer approaching a line of officers, yelling, and threw a pole at them.   Palmer pled guilty to one count: a violation of 18 U.S.C. § 111(a)(1) and (b).   In that case, the Government recommended a sentence of 63 months' imprisonment.   The Court imposed a 63-month sentence.[30]

---

[30] Palmer did not receive a three-level reduction pursuant to U.S.S.G. §3E1.1 because of his post-plea conduct.   Had he received that reduction, Palmer's guideline range would have been 46-57 months' incarceration.

*United States v. Miller*, 21-cr-75-RDM.   While on the West Plaza, Miller threw a full beer can in the direction of police. He then scaled a wall, went to the LWT, then threw objects and sprayed a fire extinguisher at police officers in the Tunnel.   Miller pled guilty to two counts: violations of 18 U.S.C. §§ 1512(c) and 111(a).   In that case, the Government recommended a sentence of 51 months' imprisonment.   This Court imposed a 33-month sentence.

Denney shares similarities with many of these defendants: He acquired and brought with him protective gear, weapons, and medical supplies (Creek).   He armed himself with a baton (or stick) that he likely acquired on the Capitol grounds and used inflammatory language (Fairlamb). He assaulted several police officers (Creek) including with weapons (Languerand, Thompson, Wilson, Palmer, Miller).

But Denney's criminal conduct was significantly worse than that of those defendants in several ways, which explains why his Sentencing Guidelines range is substantially higher than theirs.   He is set apart from them, first, by his level of preparation and planning.   As detailed above, Denney spent weeks organizing, recruiting, and procuring supplies, in concert with other militia and extremist group leaders.   He provided others with gear and weapons to take with them on January 6.   And he himself wore protective gear such as body armor – including a helmet, a vest, and hard knuckled gloves – and brought at least pepper spray, which he deployed on at least two occasions, onto the Capitol grounds.

Further, unlike several of the defendants discussed above, whose violent conduct occurred over the course of 15 minutes or less (Languerand, Thompson, Creek, Wilson) – albeit still a significant period of time – Denney's stretched for more than an hour and a half, over several areas, totaling at least seven incidents.   Moreover, Denney played a key role in facilitating the

mob's entry into the Capitol Building.   Twice he assaulted Officer K.K., who was deploying OC spray from a strategic position on a ledge overlooking the entrance to the stairs underneath the Northwest scaffolding.   Once the mob overran the officers protecting that entrance, gaining access to the stairs underneath the scaffolding, Denney joined the throng and sprayed the officers manning the next barricade on the landing.   Once these two hurdles were cleared with Denney's help, rioters had clear access to the Upper West Terrace and were inside the Capitol Building within five minutes, having established the first breach at the Senate Wing Doors. But Denney did not stop there.   He returned to the West Plaza, engaging with officers who were attempting to protect the inaugural stage and, when those officers retreated up onto the stage and into the LWT tunnel, he followed them and continued assaulting them in an effort to create another breach point. Such prolonged and premeditated violence deployed in a manner that directly led to the first and most significant breach of the United States Capitol Building warrants a substantially more significant period of incarceration.

Additionally, Denney not only failed to express any remorse for his conduct, he continued to foment violent attacks to prevent the transition of Presidential power during the inauguration on January 20 and continued to promote a violent overthrow of the presidential administration as late as August 2021. Finally, Denney, a former police officer and member of the United States Army, lied to FBI agents about his conduct on January 6 on multiple occasions.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.  *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*). Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. [31] *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; § 3663(b);

---

[31] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA.  *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

§ 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[32]   *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the

---

[32] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review."   *Fair*, 699 F.3d at 513.

sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.

Applying these principles to this case leads to the conclusion that Denney should be required to pay at least $2,000 in restitution, though the Court should defer entry of a restitution order at this time. First, his conviction under 18 U.S.C. § 111(a)(1) and (b) is a crime of violence under the MVRA. *See* 18 U.S.C. § 3663A(c)(1)(A)(i). The VWPA and MVRA provide that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d); 18 U.S.C. § 3663A(d). This Court should order Denney to pay restitution to the MPD, the employer of Sgt. K.K., to the extent it paid any expenses for his medical treatment. *See* 18 U.S.C. § 3664 (j)(1) ("If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation.") The Government requests that any restitution order that takes into account losses suffered by the MPD as a result of Denney's attack on the officer be delayed for 90 days so it can determine those costs borne by the entity. *See* 18 U.S.C. § 3664(a)(5).

## VIII.   CONCLUSION

For the reasons set forth above, the Government recommends that the Court sentence defendant Lucas Denney to a term of incarceration in the middle of the guideline range as calculated by the United States Probation Department, three years of supervised release, restitution in an amount to be determined at a later time, and the mandatory $100 special assessment for the count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:   */s/ Benet J. Kearney*
Jennifer M. Rozzoni
NM Bar No. 14703
Benet J. Kearney
NY Bar No. 4774048
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
(505) 350-6818 / (212) 637-2260
Jennifer.M.Rozzoni@usdoj.gov
Benet.Kearney@usdoj.gov