**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 22-cr-00070** |
| | ) | |
| **LUCAS DENNEY** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

**SENTENCING STATEMENT OF DEFENDANT LUCAS DENNEY**

William L. Shipley, Jr., Esq.
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com

*Attorney for Defendant*

## I.   **Introduction**

The Government's handling of this case has been careless from the very
start.

On December 13, 2021, Defendant Lucas Denney surrendered himself in
the Western District of Texas, Del Rio Division.  After an initial appearance on
December 14, and a detention hearing on December 17, without a preliminary
hearing in that district as required by rule, or an indictment by a grand jury in
this District within the time allowed by statute, Mr. Denney was ordered
transported to the District of Columbia.  That was the first violation of Mr.
Denney's rights by the Government.

For reasons that have never been explained, the United States Marshall
Service did not deliver Mr. Denney to this District until January 31, 2022 – 45
days in transit.  The time within which to have a Preliminary Hearing and the
period within which to indict under the Speedy Trial Act both expired while he
was "lost" in transit.  That was the second violation of Mr. Denney's rights.

Apparently, the DOJ prosecutors lost track of the fact that two
defendants were linked together in a single complaint, and began to schedule
the case with respect to co-Defendant Hazard while seemingly oblivious to Mr.
Denney's rights or status.  Both defendants were set for a status conference
with the Magistrate on February 4, 2022, but the prosecutor and defense
counsel for Hazard stipulated to continue that hearing for approximately 60
days.  They did so without notice to or the involvement of Mr. Denney's
counsel.  By this point, it has been 49 days since Mr. Denney's last court
appearance in Texas.   This was the third violation of Mr. Denney's rights.

When an inquiry was made in late February as to when Mr. Denney might be indicted, the answer can be paraphrased as "Two or three weeks from now. I'm trying to get time scheduled with the Grand Jury." The last day to lawfully indict him would have been January 23, 2022. That's the fourth violation of Mr. Denney's rights.

After the problem was raised with this Court by his current counsel, and with Mr. Denney about to be released from custody by Magistrate Faruqui, the Government violated the Speedy Trial Act by obtaining a single-count indictment for the sole purpose of continuing Mr. Denney's illegal detention until the prosecutors were better prepared to indict. That was the fifth, and most egregious violation of Mr. Denny's rights.

Having already committed a serious procedural error that should have resulted in Mr. Denney's release, the Department of Justice knowingly and purposely violated his rights again so that it could continue his unlawful detention.

No explanation has ever been provided.

There is no record of the proceedings before the Magistrate Judge in Del Rio. Due to an equipment malfunction, the audio recording of the detention hearing cannot be transcribed. There is no transcript of the testimony that led to Mr. Denney being detained – testimony that came from Special Agent James Farris of the FBI.

3

There does exist, however, Agent Farris's Affidavit filed in support of the Criminal Complaint. In that Affidavit, Agent Farris claimed that Mr. Denney used a "metal pipe" to assault Metropolitan Police Officer K.K.  Agent Farris included still images from videos of the incident showing the pipe – approximately 10-12 feet long – being wielded by Mr. Denney against Officer K.K.

Agent Farris signed his Affidavit on December 7, 2021 – 11 months after the events of January 6.  He had that amount of time to confirm the details of his investigation – especially a detail so critical as the type of instrument allegedly wielded as a weapon in the crime.

Not only do videos make it obvious that the pipe was made from plastic and not metal, <u>Officer K.K.</u> knew the pipe was plastic and not metal on January 6.

In an email between DOJ officials, there is a reference to Officer K.K. asking about this case. Officer K.K. had noted that a protester had swung a plastic pvc pipe at him. The email states that Officer K.K. was told that person was Mr. Denney.

This email shows that when Agent Farris signed his Affidavit, and when he testified under oath at Mr. Denney's detention hearing, Agent Farris had never, in 11 months, taken the time to contact Officer K.K. and ask him about the crime he was charging Mr. Denney with.

The falsehood about the "metal" pole survived until the indictment -- the Prosecutors saved themselves from further embarrassment by referring to the pole not as "metal", but instead as being "gray in color."

Even at that point the DOJ could not bring itself to say the pole was made of plastic.

The sad fact is that the FBI and Department of Justice have treated this case with neglect and malfeasance from start to finish.  The comedy of errors now comes to a close with a 74 page Sentencing "manifesto" that, after the introduction, doesn't mention Mr. Denney again until the page 15.

As a *coup de grace*, the Government askes this court to impose a sentence of nearly 98 months when no other defendant convicted of this charge related to January 6 has received more than 46 months.[1]

## II.  __The Offense Conduct As Set Forth By The Government__.

Mr. Denney was charged with one count of assault on a federal law enforcement officer, and he pled guilty to that one count.  The discreet facts of that incident are simple, they were captured on videotape, and there is no dispute as to two critical facts – it was plastic pipe used by Mr. Denney, and it did not strike Officer K.K.

"Offense conduct" in a case can involve more than simply the specific act[s] that relate to the count of conviction.  But while the concept of "relevant conduct" under the Sentencing Guidelines is broad, the boundaries are not without limits.

One would be hard pressed when reading the Government's Sentencing Statement to find anything therein that reflects such an understanding of the

---

[1] As noted in more detail below, defendant Robert Scott Palmer was sentenced to 68 months on the same charge by Judge Chultkun.  But between the time of his guilty plea and his sentencing, Palmer lost the -3 level benefit for "acceptance of responsibility" when he claimed in a post-plea fundraising effort that he had actually acted in self-defense and pled guilty as a matter of expediency.  With the three level reduction his guideline range would have been 46 to 57 months as was reflected in the plea agreement filed in the case.

Guidelines.  Mr. Denney recognizes the scope of criminal conduct set forth in

the description of a crime, and the scope of accountability for criminal activity

at sentencing are not coterminous.

But there is an outer boundary to the scope of events on January 6

beyond which Mr. Denney is not responsible for at sentencing, and the

Government's Sentencing Statement goes far beyond that boundary.  The

Government's attempts to embody actions of the "mob" in the person of Mr.

Denney, and to personalize the conduct of other rioters in proximity to Mr.

Denney as within the scope of "relevant conduct" upon which Mr. Denney's

sentence should be based.  Such an expansive view of "relevant conduct"

ignores the limitations set forth in the Sentencing Guidelines.

U.S.S.G Section §1B1.3(a)(1) provides that the "offense conduct" shall

include

> "all acts and omissions committed, aided, abetted, counseled,
> commanded, induced, procured, or willfully caused by the defendant"
> and "in the case of jointly undertaken criminal activity … all acts and
> omissions of others" that were "(i) within the scope of the jointly
> undertaken criminal activity, (ii) in furtherance of that criminal activity,
> and (iii) reasonably foreseeable in connection with that criminal activity."

Without expressly saying so, the Government's Sentencing Statement –

like most other Sentencing Statements in other January 6 cases – begins with

the perspective that all those present at the Capitol on January 6 bear some

measure of criminal responsibility for the actions of the "mob" in the course of

the "rioting."  The Government includes excerpts from public testimony or

public statements made by persons working at the Capitol that day describing

how they were personally victimized by the events, without any regard to

6

whether the defendant being sentenced had any connection to the persons quoted.  The same is true here with respect to Mr. Denney.

This runs afoul of the limits placed on "relevant conduct" by the Sentencing Commission's Guidelines.  Application Note 3(B) states:

> Scope: .... In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement). In doing so, the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others. *Accordingly, the accountability of the defendant for the acts of others is limited by the scope of his or her agreement to jointly undertake the particular criminal activity. Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B).* [Emphasis added].

Section II(A) of the Government's Sentencing Statement, pages 3-15 of the document, cover information and allegations beyond the scope of relevant conduct as defined by the Guidelines and are irrelevant to the issue of what is an appropriate sentence for Mr. Denney under the "Offense Conduct."

Mr. Denney submitted objections to the draft Presentence Report that totaled thirteen pages.  The Objections are broadly divided into two sections – the Offense Conduct and the Guideline Calculations.  The order of presentation of the issues is reversed here, with the Mr. Denney's view of the application of the Sentencing Guidelines dealt with first, followed by his view of the offense conduct and the factors set forth in 18 U.S.C. Section 3553a.

III.   **Application of the Sentencing Guidelines**

The Sentencing Statement filed by the Government seeks a sentence in the middle of what the Government says is the applicable Guideline Range – 87 to 108 months.[2]

That the Government would suggest such a ridiculous sentence in the context of sentences sought and obtained against other January 6 defendants on the identical charge is a basis to simply dismiss the Government's calculation as retaliation for the embarrassment visited upon them for their numerous errors in this case.

At the end of this Statement is a compendium of cases with sentencing dispositions on violations of § 111.  But, for purposes of understanding just how excessive and outrageous is the recommendation made by the Government here, one particular case is worth mentioning at this juncture.

The Government sought a sentence of only 48 months in United States v. Thompson, 21-cr-00461 RCL.  The Statement of Offense in that case included the following:

> At some point inside the tunnel, defendant Thompson bent down and gained possession of a metal baton that he found on the floor…. Thompson swung the baton … in an apparent effort to knock a can of pepper spray from the officer's hand…. Thompson has told the government he was not trying to hurt the officer….  Defendant Thompson struck Sgt. W.B. … on the arm.

---

[2] The Final PSR was filed by the Probation Officer while this Sentencing Statement was being finalized.  The Final PSR reduced the final Total Offense Level to 25, and the applicable Guideline Range to 57-71 months.  The Government's recommendation was based on the Draft PSR Total Offense Level and Guideline Range.

In the Government's Sentencing Statement in that same case it said the following about the defendant's conduct:

> A review of the videos shows during the 13 minutes Thompson was inside the tunnel, rioters were yelling and cursing at officers... After leaving the tunnel at 3:05 PM, Thompson appears to have spent some time recovering.  After approximately a twenty-minute respite, however, Thompson took off his hat and returned to the mouth of the tunnel as an engaged observer with the mob....  Thompson was among the first rioters to arrive on the inaugural stage, and he was one of the last to leave as he occupied the stage until shortly after 5:00 p.m....

Thompson did strike an Officer with a metal pole, and did cause an injury.  Thompson spent hours in the opening of the LWT tunnel, looking on while some of the worst of the fighting took place, providing encouragement and assistance where here could.

Yet the Government's recommendation for Thompson after a guilty plea to § 111(b) was for 48 months.  Now in this case, with far less egregious facts, the Government askes this Court to impose a sentence twice that long on Mr. Denney.


**Base Offense Level**

The Defendant agrees that the Base Offense Level is **14** pursuant to U.S.S.G. § 2A2.2.                                                                                    14

**Enhancement for Conviction on § 111(b).**

Mr. Denney pled guilty to 18 U.S.C. § 111(b), and based thereon agrees that a +2 level enhancement applies pursuant to § 2A2.2(b)(7).     +2

**Victim Related Adjustment – Official Victim**

Mr. Denney admits that Officer K.K. was a law enforcement officer wearing a uniform of the Metro Police Department and  was engaged in the performance of his official duties at the time of  the assault, and he was motivated by Officer K.K.'s status at that time.          +6

**Adjusted Offense Level**                                                                              **22**


Mr. Denney objects any other U.S.S.G. enhancements recommended to by the Probation Officer or sought by the Government on the basis that 1) the guideline enhancement is being applied in a manner not authorized by law, and/or 2) there are insufficient facts to support application of the enhancement based on the offense conduct or relevant conduct as defined by the Guidelines.

**"More than Minimal Planning" – § 2A2.2(b)(1)**

The Defendant objects to a 2 enhancement for "More Than Minimal Planning" pursuant to U.S.S.G. § 2A2.2(b)(1). The "assault" at issue was the discreet episode that took place over a time frame of approximately 4 seconds based on the video which captured the event.

Application Note 2 makes clear that the "planning" to be considered is in relation to the "offense conduct", as it requires a comparison of the facts of the offense conduct to the commission of the same offense "in a simple form."

The Application Note describes the nature of the distinction:

> "For example, waiting to commit the offense when no witnesses were present would not alone constitute more than minimal planning. By contrast, luring the victim to a specific location or wearing a ski mask to prevent identification would constitute more than minimal planning."

Mr. Denney's "planning" for a trip to a political rally/protest was not the "planning" of the "offense conduct" – i.e., the assault on Officer K.K. using the pvc pipe.

Mr. Denney could find no case in the D.C. Circuit applying a "planning" enhancement under 2A2.2(b)(1).

Three recent cases from other Circuits are consistent with Mr. Denney's analysis that the type of planning relevant to the 2-level enhancement under 2A2.2(b)(1) is not present in this case.

In United States v. US v. Kanu-Bradley, 2022 WL 1055179 (5th Cir. April 8, 2022), the Court found:

> "The record supports the district court's finding that there was more than minimal planning in this case. Kanu-Bradley's criminal conduct was not spontaneous ... affirmative steps in planning took place, such as bringing guns to the robbery, discussing a plan to commit the robbery, and giving a signal at the start of the robbery and assault."

In United States v. Simpson, 760 F.App'x. 931 (11th Cir. 2019), the Court wrote:

> Specifically, the record indicates that Byrd and Simpson planned to lure the CI to Byrd's apartment for the purpose of robbing the CI of the gun-purchase money. Byrd stated in a post-arrest interview that he planned the robbery with Simpson, and their actions on the day of the robbery support that interpretation. Byrd notified Simpson when the CI was on the way, and they coordinated their activities by phone while the CI was at Byrd's apartment. Then, with Byrd's tip-off, Simpson lay in wait for the CI behind the apartment building so that he could approach the CI from behind and prevent identification.

In United States v. Coombs, 823 F. App'x 613 (10th Cir. 2020), the Court wrote:

> By contrast, the government contends and Coombs does not dispute -- that the simple form of his crime required only that on a particular date, at a particular location, he knowingly assaulted another individual with a dangerous weapon with the intent to do bodily harm....
>
> ¶ [I]t is undisputed that Coombs was in a stall in the women's restroom when M.C. entered the restroom.... he was waiting in the stall and knew he was in the women's restroom... because he wrapped his

face in toilet paper, he attempted to conceal his identity. According to Coombs, his attack on M.C. was spontaneous and did not involve significant affirmative steps to conceal the offense. The district court found otherwise, and we discern no clear error in that determination.

In each case cited, the "planning" was specific to the execution of the crime charged, not generalized planning days or weeks ahead of otherwise spontaneous criminal activity that followed.  In each of these three cases there was a clear intent to commit the assault crime that was later committed in a manner that was consistent with the planning.

Most the references in the PSR to "planning" by Mr. Denney concern planning done by Mr. Denney for his trip to attend a political rally/protest on January 6, 2021.  The Government focuses on the various items acquired by Mr. Denney in advance of the trip, but never addresses the problem that all those items are equally as consistent with self-defense as they are with planned assault.  The Government has no evidence to offer this Court to suggest one is more likely than the other to be true – only speculation.

Based on press coverage of previous similar events in Washington D.C. where there was violence on November 14, 2020[3] and December 12, 2022,[4] Mr. Denney understood there was a potential for a clash with counter-protesters who might also be present at the January 6 event.

Every item of "gear" purchased and/or taken on the trip had a self-protective purpose.  Mr. Denney did not take with him a single item that could

---

[3] https://www.npr.org/2020/11/14/934957728/trump-supporters-descend-on-d-c-for-events-contesting-election-results

[4] https://www.npr.org/2020/12/12/945825924/trump-supporters-arrive-in-washington-once-again-for-a-million-maga-march

be deemed an "offensive weapon" – no knives, guns, swords, etc., -- from which it might be concluded he was planning to assault anyone in Washington D.C., and certainly not planning to assault a law enforcement officer.

The actual assault here was a spontaneous action by Mr. Denney taken in response to Officer K.K. using the OC spraying device on Mr. Denney and others in the crowd near him.  This is made clear by the fact that only 10-15 seconds before the assault Mr. Denney attempted grab the same device out of Officer K.K.'s hands.

None of the "planning" activities set forth in the PSR or advanced by the Government in its Sentencing Statement relate only to the planning "assaultive conduct" – nothing like "luring a victim to a particular location" or "wearing a mask to prevent identification" are involved in the "planning" for a trip or raising money for protective supplies or transportation and lodging expenses.

Application of the 2-level enhancement for "more than minimal planning" is not supported by the Application Note or relevant case law given the factual record of this case.

### Enhancement for Use of a Dangerous "Weapon" -- § 2A2.2(b)(2)

Mr. Denney objects to the application of § 2A2.2(b)(2) and the +4 level enhancement for use of a "dangerous weapon."  Mr. Denney did not use a "weapon" as contemplated under the Guideline.

The plastic pvc pole was an "instrument" not ordinarily used as a weapon, and that is an important distinction under the § 2A2.2(b)(2).

Where the item used was not itself a "weapon", but instead a "dangerous instrument," the 4-level enhancement requires more that simple "use." Application Note 1 under § 2A2.2 states:

> "Dangerous weapon" … includes any instrument that is not ordinarily used as a weapon (e.g. a car, a chair, or an ice pick) if such instrument is involved in the offense *with the intent to commit bodily injury*."

The pvc pipe is an instrument "not ordinarily used as a weapon."  As such, the 4-level enhancement applies only if that instrument was used "with the intent to commit bodily injury" as stated in Application Note 1.

In Mr. Denney's Affidavit, attached hereto as Exhibit "A", and as supported by the Video Exhibits 1, 2, and 3 to be filed in advance of the hearing, Mr. Denney states he was attempting to knock the pepper spray device out of Officer K.K.'s hands.  He did not swing the pvc pipe at Officer K.K.'s head or torso – he was aiming for the pepper spray device that Officer K.K. was holding and using against the crowd of protesters assembled below and in front of his position.  It was that device – and not Off. K.K. – that was the object of his intentions.

Video Exhibits 1, 2, and 3 show conclusively that the pvc pipe did not strike Officer K.K. on the hand or anywhere else.  It fell just short of him, hitting the top of a short wall he was standing behind.  It was not "swung" from side-to-side, but rather it was raised into the air and then "dropped" down in such a fashion as to land on top of the spray device in an attempt to knock the device out of his hands.[5]

---

[5] The reference to the tossing of the second "tube" does not support the application of the +4 level enhancement either.  Mr. Denney objects to any factual claim that the "tube" was a dangerous weapon or

The Guidelines provide a +2 enhancement for having pled guilty to the Aggravated Assault -- subparagraph (b) – provision of the statute.  But application of the enhancement for using a dangerous weapon requires more. It requires evidence of the actual instrument used, and the manner in which it was employed.  Mr. Denney guideline calculation includes the +2 enhancement for having pled guilty to the "aggravated assault" subparagraph (b) of § 111.

But there is factual evidence does not support the additional +4 level enhancement for having used a "weapons" or "otherwise dangerous instrument with intent to do bodily injury."  As a result, the +2-level enhancement is applied to his guideline calculation pursuant to § 2A2.2(b)(7), but not the +4 level enhancement under § 2A2.2(b)(2).

<u>Adjusted Offense Level</u>:

| | |
|---|---|
| Base Offense level | 14 |
| Conviction of §111(b) | +2 |
| Official Victim | <u>+6</u> |
| | 22 |
| Acceptance of Responsibility | <u>-3</u> |
| <u>Total Offense Level:</u> | **19** |

---

instrument pursuant to U.S.S.G § 2A2.2(b)(2)(B).  In his Affidavit, Mr. Denney described the tube as an item of trash left over from the decorations that were being installed for the Inaugural.  That item – whatever it was -- was not recovered as evidence by the Government.  It is speculation to assert or conclude it was a "dangerous weapon."  Finally, the video does not show if there were any officers in the direction that it was thrown. Any suggestion of such is also speculation.

Mr. Denney's criminal history score is 0, having no prior criminal convictions of any kind.

With a Criminal History Category of I and a Total Offense Level of 19, the Guideline Range is **30-37** months.

## IV.   **Offense Conduct**

Mr. Denney walked to the Capitol from the Stop the Steal Rally early in the afternoon on January 6.  Even though there was much social media communication ahead of January 6 about joining up with other like-minded individuals and groups, Mr. Denney, Mr. Hazard, and David went to both events without being part of any other group.  Mr. Denney and the others arrived at the location of the Capitol building along with the very large crowd coming from the Stop the Steal Rally, and the crowd continued to grow in size during the afternoon.

By the time they arrived at the Capitol Grounds, whatever barriers might have been in place earlier had been compromised and law enforcement had withdrawn to the area immediately surrounding the Capitol building.  Mr. Denney and the others did encounter not barriers or Officers impeding their path and they continued on along with the large crowd to the Capitol building itself.

Starting at just after 1:30 p.m., Mr. Denney and Mr. Hazard found themselves together in the area near the inaugural platform.  Several dozen members of the USCP and MPD had set up a barrier to prevent protesters from

getting to the Capitol building along that direction of travel.  The law enforcement officers used a combination of physical barriers, a police line with shields and batons, non-lethal munitions, and pepper spray to attempt to control the crowd which greatly outnumbered them.

Mr. Denney engaged in verbal confrontations with Officers manning the barriers, and at one point reached out and grabbed the baton of an Officer as he was attempting to use it to push Mr. Denney back.  Mr. Denney and Mr. Hazard moved from location to location in this same general vicinity over approximately 20-30 minutes while the standoff between the police and protesters continued.

Mr. Denney took notice of one particular Officer using a large pepper spray device from a slightly elevated position while protected by a small half wall in front of him.  The Officer was able to make effective use of his elevated position to pick out individuals in the crowd committing offensive acts against the Police such as throwing objects at them.  The Officer was able to pick those persons out of the crowd and hit them with a powerful blast of pepper spray.

Mr. Denney approached the location just below the half wall where the Officer was standing.  When the Officer next leaned over the wall to use his device, Mr. Denney reached up and attempted to snatch the device out of his hands.

Mr. Denney expands on and explains in his Affidavit, to the best of his recollection, the events of the remainder of the afternoon of January 6 and

thereafter.  Mr. Denney's comments in that regard are incorporated herein by this reference.

V.    **Sentencing Factors Under 18 U.S.C. § 3553a**

Pursuant to 18 U.S.C. § 3553(a), the following factors are to be considered in imposing a sentence on a defendant in a criminal case:

1.  The nature and circumstances of the offense and the history and characteristics of the defendant;

2.  The need for the sentence imposed:

    A.  To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    B.  To afford adequate deterrence to criminal conduct;

    C. To protect the public from further crimes of the defendant; and

    D. To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3.  The kinds of sentences available;

4.  The kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines.

5.  Any pertinent policy statement.

6.  The need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar

conduct; and

7.  The need to provide restitution to any victims of the offense.

1.      Nature and Circumstances of the Offense and the History and
        Characteristics of the Defendant.
        <u>Nature and Circumstances of the Offense</u>

While there may be differences between the parties on particular details

at various points along the way, the general point of view is not inconsistent.

Where the parties diverge dramatically is with regard to who Mr. Denney

is and what were his intentions in coming to Washington D.C.

From the very outset the Government has mischaracterized Mr. Denney

as the leader of a violent armed militia in Texas.  They have attempted to

associate the organization he founded, the Patriot Boys of Northern Texas, with

the much better known "Proud Boys" – a national organization often

characterized by the Government as violent extremist group and sometimes as

a white supremacist group.

But as Mr. Denney explains in his Affidavit, the PBONT are not

associated with the Proud Boys for the very simple reason that the original

founding members of the PBONT opted to not be a Proud Boys chapter when it

was first organized after the November 2020 election.  They created their own

stand-alone organization expressly for the purpose of not being subject to a

national organization or leadership from some other Chapter in the North Texas area.

The PBONT are not an "armed militia" – at least not in the sense that the Government seems to imagine such things to be here.  The organization grew in size <u>after</u> January 6, 2021, and a substantial portion of the membership in made up of former members of the U.S. Armed Forces.  The members of PBONT do not engage in gunplay for any purpose.  Given that it is Texas, most members owned and possessed firearms, and often carried their firearms for legal purposes.  But PBONT did not exist as a para-military organization although that is the way the Government has consistently mischaracterized it since the beginning of this case.

The word "militia" in Texas doesn't necessarily have the same connotation as might be given to the term in other parts of the Country.  Texas has a proud tradition of civilian militia organizations going back to "The Alamo" and earlier.  Designating a group as a militia does not necessarily suggest the group is "anti-government" in the same way that avowed anti-government groups hold themselves out regardless of what descriptor is attached to them.

The simple fact is that "militia" is a dirty word in too many places around this country, but Texas is not one of those places.

Combined with social media involvement by Mr. Denney – as reported by him – with various leaders of Proud Boys chapters around the country, the Government wants this Court in sentencing Mr. Denney to see him as if he

were the leader of a violent extremist group aligned with the Proud Boys.  But that is simply not factual.

The discovery in this case has no actual communications between Mr. Denney and any identifiable leader of any Proud Boys chapter or member of the Proud Boys national leadership.  It has Mr. Denney claiming to have had interactions with people fitting that description, and then reporting back to people on his own Facebook page that was open to the public.  But Mr. Denney had no way to verify the claims in that regard being made by people he was chatting with online in the days and weeks prior to January 6.

The reality was that when Mr. Denney and his two companions arrived in D.C. during the day on January 5, they were not part of some larger gathering of Proud Boys groups.  When they went to the Stop The Steal Rally and then to the Capitol on January 6, they were again alone just the three of them.

Within the crowd on January 6, Mr. Denney was as common and ordinary as nearly everyone else in attendance.

### History and Characteristics of Lucas Denney

Mr. Denney has no prior criminal record.

Mr. Denney comes from a family background that places high value on military service and service to the community.

Lucas Denney is a single father of two teenage children for whom he has had primary legal and physical custody since his divorce from their mother a

decade ago.  He has maintained a stable household for his children primarily with the disability pension he receives from the Department of Defense.

Mr. Denney enlisted in the United States Army and served four years in a Military Police unit.  He did one combat tour in Iraq during which he was nearly killed in a high-speed Humvee accident.  Mr. Denney suffered traumatic brain injuries that resulted in him being given a 100% disabled rating.  He has undergone continual treatment by the Veteran's Administration since the time of his discharge.  He suffers from PTSD and memory lapses which make it difficult for him to maintain steady employment.  He is on various medications which he will likely continue for the rest of his life.

Even with those obstacles in his path, he was given physical and legal custody of his two children when they were approximately 4 and 6 years old, He has provided a stable living environment for them up to the date of his arrest in this case.  Each of Mr. Denney's children has written letters to this Court on his behalf, as has Mr. Denney's ex-wife Loren Denney who – according to her own words – never imagined she would be writing such a letter in support of her ex-husband and, more importantly, their two children.

Mr. Denney's father, Robert Denny, is a retired member of the Dallas Police Department, having served that community for 26 years in that capacity. Before that, Robert Denney served in the United States Marine Corps.

Military service and service to the community through law enforcement are matters that run in Mr. Denney's family.  This is exemplified by the fact that Mr. Denney opted for the military specialization of "Military Police" when

he first joined the Army.  Mr. Denney has lived this embodiment as well in his
own life, as reflected in the fact that he has no prior criminal record.

In short, before January 6, 2021, Mr. Denney had led and exemplary
law-abiding life while raising two children as a single parent suffering from
serious disabilities stemming from his military service.  Yet, as reflected in the
character letters written on his behalf, Mr. Denney rarely if ever stopped his
efforts to help others in his community.

2.   <u>Needs of Sentencing</u>.

a.   Seriousness of the Offense, Respect for the Law, and Just
<u>Punishment</u>.

The sentences to be imposed on dozens – maybe hundreds – of
individuals prosecuted for serious crimes committed on January 6 will leave a
long and indelible legacy on the Criminal Justice System. Mr. Denney's
sentence by itself is just one "data point" in what will eventually be a large
mosaic.  There is no doubt that the country has taken note of the seriousness
of the unlawful behavior that took place on January 6, and if left unpunished
such unlawful behavior undermines respect for the law.  Notwithstanding the
Government's hyperbole, nothing about the particular actions of Mr. Denney
warrants harsher treatment that might normally be the case – in fact, just the
opposite is true.

Mr. Denney engaged in verbal confrontations; grabbed and pulled on a
metal barrier; grabbed a police baton – without gaining control – as it was
being used against him; attempted to snatch a pepper spray device out of an

Officers' hands; used a length of plastic pipe to attempt to knock the same device from the Officer's hands; threw a hollow tube that was an item of trash laying on the ground; and entered the LWT where the mass of bodies made any kind of meaningful physical effort against any other person difficult if not impossible.

The crime of conviction here is "assault.  The "seriousness" of similar offenses committed on January 6 exists along a spectrum -- from most serious actions to least serious actions, particularly when considering any resulting injuries.  Mr. Denney did not employ a "weapon" against any law enforcement officer.  He did not personally injure any officer.  He did not participate in any assault as a member of a group where an Officer was victimized and/or injured by virtue of being outnumbered.

Thus, on the spectrum of seriousness of the offense, Mr. Denney's actions would recommend the need for less time in custody.

      b.    <u>Deterrence</u>

There have been numerous sentencings already in cases where defendants were convicted under 18 U.S.C. § 111(a) and (b).  Each case has resulted in time in custody for the defendant.   That the Government has been as aggressive as it has been – particularly with prosecutions for violations of § 111 counts -- reflects the need to deter violence against federal law enforcement officers doing their jobs and to promote respect for the law.  Mr. Denney accepts that sentence representative of this need will be imposed.

      c.    <u>To Protect the Public From The Defendant.</u>

This factor does not suggest a lengthy sentence is needed.  Mr. Denney has never been arrested in his life prior to this case.  The events of January 6, 2021, represent grossly aberrant behavior on his part.  This factor would recommend only a minimal sentence is needed, as Mr. Denney is unlikely to constitute any threat to the public following the conclusion of this case.

      d.    <u>To Provide for the Needs of the Defendant</u>.

This is one of the more troubling aspects of sentencing in this case.  Mr. Denney has been in the care of the VA for service-related injuries for more than 15 years.  His "needs" in this regard are largely psychological and are provided for by the VA and assisting agencies.  The Bureau of Prisons is a poor substitute for the medical and mental health care he receives now.  This factor would recommend a lesser sentence so as to not do more damage that is necessary to the balanced care he has received for many years.

    3.    <u>Avoiding Unwarranted Sentencing Disparities</u>

The Defense has found three January 6 cases involving a guilty plea and sentencing to a violation of § 111(b), aggravated assault.

U.S. v. Thompson, 21-cr-00461 RCL – **sentenced to 48 months**.

U.S. v. Palmer, 21-cr-00328 TSC – **sentenced to 68 months**.

U.S. v. Languerand, 21-cr-00353 JDB – **sentenced to 44 months**.

Another four cases have involved sentences to violations of Section 111(a).

U.S. v. Fairlamb, 21-cr-00120 RCL – **sentenced to 44 months**.

U.S. v. Miller, 21-cr-00075 RDM – **sentenced to 33 months**.

U.S. v. Leffingwell, 21-cr-00005 ABJ – **sentenced to 27 months**.

U.S. v. Creek, 21-cr-645 DLF – **sentenced to 27 months**.

One case, U.S. v. Wilson, 21-cr-00345 RCL, involved a sentencing where the conviction on a § 1512(c) count determined the Total Offense Level.  But the facts of Wilson are instructive, so they are set forth below as well.

The Thompson case is referenced above and involves more egregious offense conduct.  Thompson did strike an officer on the arm with a metal baton and Thompson remained in and around the entrance to the LWT nearly the entire time violence was taking place between federal officers and protesters.  As the Government said, he was among the first to arrive and the last to leave the inaugural platform area during the long afternoon of violence clashes at that location.

U.S. v. Palmer involved a plea agreement that provided for a sentencing recommendation of 47 months. Between his guilty plea and the date of sentencing, Palmer claimed in a fundraising solicitation that he only pled guilty for expediency, and that he had actually acted in self-defense.  As a result, Judge Chutkin denied him the 3 level reduction for acceptance of

responsibility.  The 68 month sentence was the bottom of the resulting guideline range.

In U.S. v. Languerand, the Defendant threw numerous dangerous objects at law enforcement officers inside the LWT over an extended period of time. The Government's Sentencing Memorandum (ECF 34) stated as follows:

> By approximately 4:52 pm., Languerand had come down to the UWT and was on the steps just below the LWT archway.  For the next 10 minutes, Languerand moved in and out of the front lines of rioters, taking turns with the other rioters who were relentlessly attacking the police.
>
> … Languerand took a white piece of wood from another rioter and threw it at the officers….
>
> … Languerand and another rioter threw a heavy black audio speaker at the police….
>
> … Languerand threw two sticks in rapid success at the officers, which landed inside the tunnel….
>
> Three minutes later, Languerand threw another stick at the officers , which ricocheted off their riot shields…
>
> A few seconds later, Languerand threw a large orange traffic bollard, which ricocheted off the riot shield before colliding with multiple officers inside the archway….
>
> About one minute later, Languerand threw a pepper spray container… followed by a bottle of liquid…
>
> Approximately 30 seconds later, Languerand threw a piece of wood…
>
> A few seconds later Languerand threw another stick at the police…

Languerand admitted that many of the objects he threw, because of their size and weight, and the velocity at which he threw them, were capable of causing great bodily injury.   Languerand was sentenced to 44 months.

The four other cases involving § 111(a) are also relevant for purposes of considering unwarranted sentencing disparity.

In United States v. Fairlamb, 21-cr-00120 RCL, the defendant pled guilty to a violation of Section 111(a).  Fairlamb physically assaulted an MPD Office but did not use a weapon in doing so.  The Government's Sentencing Statement (ECF No. 50) in Fairlamb stated:

> As the Court will see, the defendant follows a line of MPD Officers and aggressively screams at them, "Are you an American? Act like a fucking one! . . . You guys have no idea what the fuck you're doing!" The defendant continues to scream at the line of MPD officers and inserts himself into the middle of their line, cutting off MPD Officer Z.B. The officer attempts to move Fairlamb out of the way, but the defendant responds by shoving Officer Z.B. so hard that he falls into a line of watching rioters. Fairlamb sticks his finger in Officer Z.B.'s face, and when Officer Z.B. pushes the defendant's hand aside, the defendant swiftly punches Officer Z.B.'s face shield.

Fairlamb struck a deliberate and forceful blow to the face of the Officer, which only failed to cause injury because of the protective shield on the front of the Officer's helmet.  Fairlamb was sentenced to 44 months.

This Court sentenced Matthew Miller, 21-cr-00075 RDM, after a guilty plea to a 111(a) count.  Miller had discharged a cannister of fire retardant from a fire extinguisher inside the LWT where police were maintaining a line against the rioters, as well as throwing an unknown number of "D" cell batteries at Officers inside the LWT.  In the Statement of Offense (ECF No. 75) filed along with his Change of Plea, the Government wrote the following description of Miller's criminal conduct:

Once on the Lower West Terrace and close to the tunnel, the defendant waved his hand, and said multiple times, "Come on" as the mob chanted "Heave! Ho!" and rocked back and forth in a push towards the tunnel entrance, where law enforcement officers were attempting to secure the U.S. Capitol. Multiple times, the defendant also put up his fingers and yelled, "one, two, three, push!"

From this position, the defendant also threw a few unidentifiable objects towards the Lower West Terrace tunnel where law enforcement officers were attempting to secure the U.S. Capitol.

At approximately 4:55 PM, and at his closest position to the Lower West Terrace tunnel, the defendant used a fire extinguisher to spray directly into the tunnel where the law enforcement officers from the Metropolitan Police Department and United States Capitol Police were stationed, defending this entrance to the U.S. Capitol building

This Court determined Miller's guideline range to be 41 to 51 months on a § 1512(c) charge, but departed downward to impose a sentence of 33 months on both the 1512(c) charge and the 111(a) charge.

In United States v. Leffingwell, 21-cr-00005 ABJ, the Defendant pled guilty to a Section 111(a) charge.  The Government's Sentencing Statement (ECF No. 31) described the offense conduct as follows:

> At that point, the line of officers began pressing on the crowd, including Leffingwell, to back them out of the threshold of the Senate Wing doors. Leffingwell had a choice: either comply with the direction of the officers or fight back. He chose the latter. He first punched Officer D.A. in the head, and then as he continued to swing, he punched Officer W.H. in the head, before eventually punching Officer D.A. once more.

The defendant landed at least three blows to the heads of two different officers, unlike Mr. Denney who did not strike any officer.  Leffingwell was sentenced to 27 months.

In United States v. Creek, 21-cr-645 DLF, the Defendant pled guilty to a § 111(a) count. The Government's Sentencing Statement (ECF No. 48) stated as follows:

> Creek ran through the front of the crowd, grabbing a Metropolitan Police Department (MPD) Officer J.C.M… and driving him backward forcefully several feet through the West Plaza. After letting go of Officer J.C.M., Creek hit him in the face shield of his helmet…. Creek then made a beeline for a U.S. Capitol Police (USCP) officer (hereinafter referred to as "Officer R.S.E.") who was attempting to protect himself behind a bike rack barrier and a police shield. Creek went around the bike rack barrier, gave Officer R.S.E. a hard shove in the shoulders, and then kicked him, causing Officer R.S.E. to fall backward to the ground.

Creek physically assaulted two different officers, punching one and knocking the other to the ground. Creek was sentenced to 27 months.

Finally, United States v. Wilson, 21-cr-00345 RCL, involved guilty pleas to both a § 1512(c) count and a § 111(a) count. Notably, the offense conduct involved in Wilson included the use of a plastic pvc pipe, only this time the defendant did use the pipe as a weapon to strike Officers. The Government's Sentencing Statement (ECF No. 29), reads:

> Undeterred, Wilson picked up a several feet long white cylindrical object, believed to be a thin polyvinyl chloride (PVC) pipe, and indiscriminately struck at the officers with it, striking A.G., as charged in Count 3 of the Indictment. (Exhibit #5). After assaulting A.G. with the thin PVC pipe, Wilson threw it into the crowd of officers, striking W.B. (Exhibit #6 & Figure #1). Next, another rioter yelled, "Send the shield back, send the shield back" and "Take the goddamn shield," at which point Wilson, along with other rioters, pushed P.N. to the ground and attempted to take his riot shield.

> Ultimately, Wilson spent approximately 14 minutes in the Lower West Terrace tunnel.

The Guideline calculation for Wilson ended up being based on the §
1512(c) count, with Wilson being sentenced to 46 months, the low end of the
guideline range as determined for that Count.  The guideline range for the
111(a) would have been only 33-41 months.

The Wilson case is particularly instructive because the exact same
dangerous instrument was used by Wilson, and it was actively employed by
him as a weapon to repeatedly strike Officers.

Yet the +4 enhancement for using the pvc pipe as a "weapon" was not
applied as is being done here even though the pvc pipe was used in a more
egregious fashion by Wilson than is the case here.

It would be a manifest injustice for Mr. Denney to have 4 levels added to
his guideline calculation when no such enhancement was made for use of the
same instrument in Wilson.

## FINAL PRESENTENCE REPORT AND REQUST FOR VARIANCE

The Final Presentence Report does not recommend a +4 enhancement for
use of "body armor".[6]

The Final PSR determines the Total Offense Level to be 25, and the
Guideline Range to be 57 to 71 months.

---

[6] At the bottom of this Sentencing Statement is a section that was removed from the Guideline Calculation
argument set forth above, objecting to the recommendation in the Draft PSR that the +4 level enhancement for
body armor be applied.  The section is included at the bottom because the Government has argued in its
Sentencing Statement that the +4 level enhancement should be applied.

Mr. Denney's position is that the Total Offense Level should be 19 (no "planning" and no "dangerous weapon" enhancements) and the Guideline Range should be 30-37 months.

Defendant Lucas Denney requests that this Court apply a variance to what the Court determines the final guideline range to be, and impose a sentence of not more than 24 months.

This variance is justified based on consideration of the Section 3553(a) factors.

With the exception of Defendant Roberts, who lost his "acceptance of responsibility" benefit, the highest sentence on a § 111 charge has been 48 months, and the lowest sentence has been 27 months.

When taking into context the nature of the offense conduct in each of the other § 111 cases, it would be an unwarranted sentencing disparity to impose a sentence 9 months longer on Mr. Denney than has been imposed on any other defendant to date as is being recommended by the Final PSR.

If the seriousness of offense conduct in the § 111 cases were to be plotted on a spectrum, Mr. Denney's conduct would fall towards the least serious end of that spectrum.  In fact, of the seven other cases identified above, Mr. Denny's conduct seems to have been the least serious.  He did not physically strike or injure any person.  He did not use a "weapon" nor employ an otherwise dangerous instrument in a manner intended to cause bodily injury.

Further, based on the Plea Agreements, none of those other cases had a +2 level "planning" enhancement applied to them.  Without the "planning" enhancement in this case Mr. Denney's Guideline Range would fall to 46 to 57 months.

The 3553(a) factors warrant a significant downward variance.  Mr. Denney has been a single parent raising his two children from the ages of 4 and 6 to their current ages of 14 and 16.

Mr. Denney has no criminal history and his conduct on January 6, 2021 was "grossly aberrant behavior" on his part.  There is no need for the Court to "protect" the public from Mr. Denney in the future.

Mr. Denney served honorably in the United States Army, enlisting during wartime, and did one tour of duty in Iraq.  Because of injuries suffered during that tour, Mr. Denney has been determined to be 100% disabled by the Defense Department.  He and his children are supported primarily by his military pension and benefits.  Mr. Denney receives regular medical and mental health care from the VA for PTSD and other wartime injuries.  A lengthy period of incarceration in the Bureau of Prisons would be detrimental to the treatment he has received for almost 15 years from the Veteran's Administration.

Two Judges of this Court have already determined that sentences of 27 months are sufficient to recognize the seriousness of the offense, the need for respect of the law, and to provide generalized deterrence of any similar actions in the future.  This Court has found that a sentence of 33 months – without the same 3553(a) considerations – was sufficient for the same purposes.

Based on all the above, Defendant Lucas Denney requests a sentence be imposed of not greater than 24 months.

Dated: July 14, 2022                     Respectfully submitted,

                                         /s/ William L. Shipley
                                         William L. Shipley, Jr., Esq.
                                         PO BOX 745
                                         Kailua, Hawaii 96734
                                         Tel: (808) 228-1341
                                         Email: 808Shipleylaw@gmail.com

                                         *Attorney for Defendant*

**Deleted Section Opposing Application of Body Armor Enhancement

### **Victim Related Adjustment – Use of Body Armor**

Mr. Denney objects to the application of the 4-level enhancement for use of "body armor."

The Draft PSR provided no factual basis for the recommendation that this enhancement be applied. No "body armor" was identified in the "Offense Conduct" or the "Guideline Calculation" sections of the PSR.

Mr. Denney assumed the application was based on the fact that at many times during the day on January 6 he was captured on videotape while wearing a helmet. Nothing in the Draft PSR connected the application of this enhancement to the "vest" Mr. Denny acquired ahead of his trip which he wore on January 6.

In Application Note 1 to Section 3B1.5(2)(B) defines "body armor" as "any product sold or offered for sale, in interstate or foreign commerce, as personal protective body covering intended to protect against gunfire…."

Mr. Denney's Objections to the Draft PSR noted that the helmet he was wearing was a hard-shell plastic helmet of the type sold at sporting goods stores as protective headgear for batters playing baseball. While it may have afforded him some protection from blows to the head, but it would have been ineffective in protecting him against gunfire.

It was not until the Government's Sentencing Statement that the supposed factual basis for the 4 level "body armor" enhancement was connected to the "vest" Mr. Denney wore on January 6.

But application of the 4-level enhancement requires an evidentiary basis. There is no evidence before this Court that the vest worn by Mr. Denney would have protected him against gunfire.

Mr. Denney, an Iraq combat veteran, certainly has extensive first-hand knowledge of anti-ballistic vests and how to use them.  As Mr. Denney states in his Affidavit, while the vest he purchased ahead of the trip was not one capable of being a "plate carrier", and he was not wearing an anti-ballistic armor plate inside the vest on January 6.  Those are extremely heavy and Mr. Denney was significantly older and not nearly as strong as he was in his mid-20s when he last wore an anti-ballistic vest with an armored plate in Iraq.

The Government's Sentencing Statement acknowledges that the vest at issue was not found during searches of Mr. Denny's home or storage unit.  The Government offers no actual <u>evidence</u> so support application of this enhancement based on the vest being "body armor" as defined in the enhancement.  In the absence of actual evidence, the Government offers the following:

> In video and photographic footage from January 6, Denney is wearing what appears to be wearing a protective vest underneath his shirt. For example, in Exhibits 9C and 15D, discussed above, and Government Exhibit 24, there appears to be something hard and molded underneath Denney's outer layer…

Government Sentencing Statement, p. 54.

> Although the Government was not able to obtain the protective vest Denney wore on January 6 through search warrants or otherwise, Denney's messages indicate that the vest was, in fact, body armor, that is, intended to protect the wearer from gunfire. As he told one Facebook user, vests "with the armor plating" are expensive, but he was able to get

a "good price" with his "military discount." And, while Denney professed to need the vests to "protect from being stabbed," <u>it stands to reason</u> that the son of a veteran police officer who served in the military police who violently <u>engaged with armed police officers protecting the Capitol ... would anticipate the possibility of gunfire as well</u>.

<u>Id</u>. at p. 55-56.

"There appears to be something hard and molded"; "the Government was not able to obtain the protective vest"; "it stands to reason...."

"Something hard and molded" is not evidence that whatever it might have been would have protected Mr. Denney from gunfire. The same applies for something described as a "protective vest." Neither meets the definition of "body armor" necessary to apply the enhancement. The Government invites the Court to do so based on speculation alone.

Mr. Denney addresses this issue in his Affidavit. He states that the vest he purchased and wore was not a "plate carrier" model. It was padded but it was not anti-ballistic in the sense that it would protect him from gunfire. He acquired the vest to take to D.C. because of concerns he had about being stabbed by counter-protesters as had happened at prior rallies. He was not aware of anyone suffering gunshot wounds at prior rallies so he was not concerned about that happening on January 6. That is why there is a reference in one of his Facebook messages to needing to get a "stab-proof vest."

The Government also uses tortured logic to suggest that a 2 level enhancement would be appropriate because Hazard wore body armor given to him by Mr. Denney. The Government claims Hazard doing so is "jointly undertaken criminal activity" since Mr. Denney provided Hazard with the vest

he wore.  But co-Defendant Hazard's post-arrest statement claiming he was wearing "body armor" given to him by Mr. Denney is equally unavailing.  The Government does not have the vest Hazard wore, and there is <u>no evidence</u> that what Hazard characterized as "body armor" would fit the definition of "body armor" in Application Note 1 to Section 3B1.5(2)(B).

On that basis, Mr. Denney objects to the either a 2 or 4 level enhancement under § 3B1.5(2)(B) due to the lack of any evidence to support a finding that he wore "body armor" as that term is defined in the Guideline.